TEXAS & P. RY. CO. v. DIEFENBACH et al.†]

(Circuit Court of Appeals, Fifth Circuit. February 2, 1909.)

No. 1,797.

1. CARRIERS (§ 365*)—PASSENGERS—REFUSAL TO PAY FARE—EJECTION.

A carrier of passengers may eject with as much force as is necessary all persons liable to pay fare who have not paid and who refuse to pay.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1450–1452; Dec. Dig. § 365.*

Liability of railroads for ejection of trespassers, see note to Great Northern Ry. Co. v. Bruyere, 51 C. C. A. 578.]

2. CARRIERS (§ 364*)—TRESPASSERS—EJECTION—ASSISTANCE OF OFFICERS.

Where the ordinary agents of a carrier at one station had failed to eject certain trespassers from a stock car in which certain horses were being transported, and there was reason to expect the same and as effective opposition at the succeeding station, resulting either in delaying the train or compelling the car to be set out for daylight, the carrier was entitled to call the local police to eject the trespassers from the car.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 364.*]

3. CARRIERS (§ 352*) — EJECTION OF TRESPASSERS—ACTS OF LOCAL POLICE—RESPONSIBILITY OF CARRIER.

Where a carrier's train dispatcher having authority to eject trespassers called the local police of a city to assist in so doing, the police acted as agents of the carrier, which was liable for any excesses.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1414; Dec. Dig. § 352.*]

4. CARRIERS (§ 359*)—TRANSPORTATION OF PASSENGERS—RIGHTS OF PASSENGER—FORFEITURE.

Where three persons entitled to ride in a stock car to care for horses being transported therein permitted three others who had no right in the car to ride therein, and any one of the three entitled to transportation for any purpose closed and fastened the doors of the car and knowingly refused to open it at the request of the conductor or employés of the carrier when they sought to ascertain who were inside the car, to identify the passes, and inspect the transportation contracts of those holding them, the passenger so doing thereby forfeited his rights as a passenger so far as was necessary to carry out the regulations of the company, though there was no conspiracy between the three passengers and the trespassers to procure free transportation for the latter.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1439–1442; Dec. Dig. § 359.*]

5. CARRIERS (§ 384*)—TRESPASSERS—EJECTION—ACTIONS—INSTRUCTIONS.

Where D., traveling in a stock car with certain horses, was permitted to take two of his assistants in the car to the first division point on promising to purchase tickets for them, which he failed to do, and for this reason the assistants were ejected and arrested, the carrier was entitled to an instruction in an action therefor, in which it was claimed that the carrier was guilty of wanton misconduct in calling on the police to assist in the ejection, that if D. promised to get tickets for his assistants at the division point it was his duty to do so, and they would be on the car without right after passing such point, though they were asleep at that time.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 384.*]

6. CARRIERS (§ 361*)—EJECTION OF TRESPASSERS—REFUSAL TO SHOW TICKETS OR PAY FARE.

Where certain persons attempted to procure passage in a stock car, some of whom had transportation and others did not, those holding trans-

portation and refusing to show the same when demanded by the conductor, and those refusing to pay fare when demanded, became trespassers and subjected themselves to ejection.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 361.*]

7. CARRIERS (§ 361*)—LIVE STOCK—PERSONS IN CHARGE—EJECTION.

Where B. was permitted to ride in a stock car of a fast freight line to the first division point on his promise he would there buy a ticket, and he failed to do so, but attempted to continue his transportation in the car without right, he was a trespasser, though he was the owner of some of the horses being shipped in the car under contract between the carrier and another, and was therefore subject to ejection.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 361.*]

Shelby, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of Texas.

T. B. McCormick and F. H. Prendergast, for plaintiff in error.
F. M. Etheridge, for defendants in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. This is a suit brought by A. J. Diefenbach against the Texas & Pacific Railway Company for damage resulting from an alleged illegal arrest and assault committed on Diefenbach by the defendant and its agents while Diefenbach was a passenger traveling on a freight train, in care of stock. John Doran, A. E. Buck, and D. N. Martin each brought suit in his own behalf against the same defendant for damages growing out of the same transaction. By agreement of all the parties, the four suits were tried together before the same jury, and one record presents the four cases in this court.

On November 26, 1906, these parties, together with Charles Mulner and William Corrigan, were at Shreveport, La., in charge of a lot of 14 horses which were to be shipped from Shreveport to Dallas. Eight of these horses belonged to W. O. Foote, and were in charge of A. J. Diefenbach, Charles Mulner, and William Corrigan. Four of the horses were owned by George R. King, and were in charge of John Doran and D. N. Martin. Two of the horses belonged to A. E. Buck, and he had charge of them. The 14 horses were loaded in one car at Shreveport, and the six men boarded the car to travel with the horses. Diefenbach, Doran, and Martin had transportation; Buck, Mulner, and Corrigan did not. The railroad agent at Shreveport objected to any person going in the car who did not have transportation. After considerable discussion, more or less intemperate and heated, it was finally arranged that Buck, Mulner, and Corrigan should be allowed to go in the car with the others to Reisor, a station eight miles out from Shreveport, without tickets, on the promise that they would procure tickets at Reisor. Reisor is a station on the main line of the Texas & Pacific Railway, about 8 or 10 miles out from Shreveport, and trains traveling from New Orleans to Dallas pass through Reisor, but do not go to Shreveport. Cars are brought from Shreveport out to Reisor, and return by a switch engine stationed in Shreve-

port. On the above understanding that the three parties should obtain tickets at Reisor, they were carried to that station by the switch engine from Shreveport, and the car was left there, to be carried on to Marshall and Dallas by the through freight on the main line, which was due to leave there that same night, the car having left Shreveport for Reisor at about 7 o'clock, and the train arrived at Reisor some time between 10 and 11 o'clock the same evening.

The three parties did not obtain tickets at Reisor. Diefenbach and Buck swore that they were asleep and were not wakened up at that place. Martin says that every one was asleep when they reached Reisor. He says:

"I didn't know when we got to Reisor until we were about to pull out from there. At Reisor, in coupling the cars, there seemed to be some difficulty in making the coupling; they bumped the cars several times pretty hard, and that woke me up. I opened the door and asked the man what was the trouble, and he said, 'Nothing, only we are picking you up to take you to Marshall.' That is the first I knew where we were. The next time I woke up, some one was hammering on the door at Marshall."

Doran testifies:

"I don't know whether we ever got to Reisor. I wasn't wakened by any one; never saw a conductor or anybody."

On the other hand, Kimbrough, the engineer who pulled the car over from Shreveport to Reisor, says:

"I saw the parties after we got to Reisor; I can't tell how many I saw; when I got to Reisor I notified them we were at Reisor. At Reisor we pulled up on the main line and backed down into the yard to set our train out, and when I shoved down there, after I put my train away there, I went to the door and notified them we were at Reisor, and they could get off and provide themselves with tickets. I think, when I shoved down, the side door was open or partially open. When I walked up that way, as well as I remember, they were at the door already; I can't tell you how many were at the door. I saw more than one; I don't recognize any of them I saw there, except the large man over by the wall there (Mr. Martin); I saw him at Reisor. I just remarked to him that that was Reisor, and they could get out and buy tickets."

Mr. Jenkins, conductor on defendant's railway at the time and place, says that he was advised from Marshall that there were a lot of men on the car from Shreveport that were not provided with tickets, and was directed to see that they had first-class transportation before moving the car. He says:

"When I got these orders I went back to the car while the engine was taking coal and rapped a few times. I rapped on the south side of the car— the east end of the south side. * * * I rapped on the door several times before I could get any answer whatever. Finally the door was opened about that far (indicating), but, before the door was opened, he asked who it was— the man inside asked who it was—and I told him I was the conductor, and we were picking up cars and wanted to see his transportation; then he opened the door a very small space—I couldn't tell the man to save my life—and handed out two contracts. I looked at the contracts and saw they were all right, and I told him I understood there were a lot of men in there that had no transportation, and one of them remarked, 'By God, if there is anybody else in here, I don't know anything about it,' and slammed the door. * * * I then tried all around to get in, and no one would let me in at all. I tried both ends of the car. I tried on the south side at both

ends; I was about that car some five or eight minutes trying to get in— something like that. I went and told the dispatcher I was unable to get in, and he told me to bring the car on to Marshall. I had received instructions to see that they had transportation. I didn't receive instructions to break in the car door or anything like that. I never got admittance to the west end of the car. I knocked on the door and tried to get admittance. I made a considerable alarm on the door. I knocked on the door with my knucks. I asked them to open the doors, and received no response at all."

J. C. Meade testifies that he, with the conductor, Jenkins—

"went down with a Shreveport car. As soon as we arrived at Reisor the conductor went to the office to get his waybills to see what cars went, and came on back, and rapped on the door quite a little while before any one came to the door. He asked for transportation, I believe, for the parties in charge of this car. He rapped on the door quite a little while before anybody came and opened the door. Finally he got the door partly opened, and was handed out some papers—I suppose contracts; looked something like that—and he looked over them and gave them back to them. He shut the door, and he went on and got the numbers. I generally have to go with him to get the numbers. * * * He went to the office and got his bills, and during that time he was instructed that there were some other parties in the car, or something like that, and we went on back and he rapped on the door again, and the party inside wanted to know what he wanted, and he says he wanted their transportation—of the other parties in the car—and they made some sort of remark I didn't understand, like 'if there was anybody in there it was their business,' or something similar, and they wouldn't open the car any more. I didn't hear them say they wouldn't open it; they said, if there was anybody in there, it was their business. They didn't open the car. I guess he was engaged 10 minutes, all told, trying to get in this car."

Information as to the contention at Shreveport and the failure of the parties not provided with transportation to get tickets at Reisor, and of the inability of the railroad agents to get into the car at Reisor, was received by the train dispatcher at Marshall, and he issued instructions to the conductor to bring the car on to Marshall, and then called on the city police to meet the train and investigate. The train dispatcher testified:

"I sent the call boy over to call the city police to tell them that No. 67 would be there about 12:30, and that these parties inside defied the conductor at Reisor and wouldn't allow him to see their transportation, and I wished they would come down and see into it."

Further, on cross-examination, he testified:

"My duties are various; among them it is my duty to cause the ejection of people riding on the trains when I consider them trespassers. These men I considered trespassers, and summoned the officers for that purpose."

When the car arrived at Marshall some hours later, two city policemen, accompanied by a deputy sheriff whom they had called in, and the yardmaster, went to the car, and after some delay succeeded in gaining an entrance. Diefenbach, Buck, Martin, and Doran all testified that they were asleep when the car arrived at Marshall, and opened up the car as soon as they were aroused. The two policemen and the deputy sheriff testified that they knocked and called and shook the car door for some time, demanding entrance, and that it was only after the yardmaster called out that the car should be set out that it was opened.

The officers entered the car and arrested Buck, Diefenbach, Martin, and Doran, and, refusing to look at the transportation offered for the last three, handcuffed the four and carried them before the train dispatcher. The officers did not find Corrigan and Muller, although the two men were in the car and were unprovided with transportation. In arresting Diefenbach, the deputy sheriff struck him with a billy, Diefenbach says, without provocation. The deputy sheriff says that, when he entered the car, Diefenbach said, "Who in hell are you?" "I told him who I was, and he says 'To hell with you,' and drew back and hit me. I had a billy and I hit him."

When the parties arrested were carried before the train dispatcher, he examined their papers and held that Diefenbach had a contract and had a right to go in the car; that Martin and Doran had return contracts which entitled them to return transportation, and that they ought not to be held, and that as Buck had no transportation he had no right to be in the car; and thereupon Diefenbach, Martin, and Doran were allowed to proceed with the car, and Buck was held under arrest and subsequently carried before the city court, where, after some talk, he pleaded guilty to riding on a railroad train without a ticket, and, on payment of a fine, was released.

The record showed that Buck testified that he had money enough with him to pay for his transportation, and that Diefenbach testified that he had the money to pay for the transportation of Mulner and Corrigan, and that after leaving Marshall and at Mineola he did, through Martin, buy tickets for Mulner and Corrigan from Marshall to Mineola, and from Mineola to Dallas. If Diefenbach at any time bought any tickets for Mulner and Corrigan from Shreveport to Marshall, the transcript does not show.

On the trial in the court below, Diefenbach recovered a verdict and judgment of $1,400; John Doran recovered a verdict and judgment of $800; Lee N. Martin recovered a verdict and judgment of $800; and A. E. Buck recovered a verdict and judgment of $1,400. Hereinafter the plaintiff in error will be designated as the company, and the defendants in error, plaintiffs below, as the plaintiffs.

The errors assigned cover nearly all the matters contained in the judge's charge and in the requests refused, but we need not deal with them seriatim. The undisputed facts in the case up to the time the car containing the plaintiffs reached Marshall furnish the standpoint from which to determine the rights and duties of the parties and the effects of the subsequent proceedings. The car in which plaintiffs went from Shreveport to Marshall and from which they were forcibly removed was not one intended or used for the carriage of persons, except in connection with live stock therein, and no person had the right to ride in such car except under previous contract with the company or by permission previously obtained on fare paid in advance. The car itself, while in transit, was not accessible to the company's agents for the collection of fare or the taking up of tickets. This car left Shreveport with six men therein, three of whom had transportation over the road and three without transportation, but under the promise or understanding that the latter should get tickets at Reisor. It is

also undisputed that although there was plenty of time no tickets were obtained at Reisor, nor was any effort made to obtain tickets, but, on the contrary, on the practically undisputed evidence of the company's agents, the car was kept closed, information refused, and access denied. From Reisor the car with the men therein was carried on to Marshall, and at Marshall, by the practically undisputed evidence, it was kept closed until after much rapping and a threat was made to set the car out. The only dispute to this fact is the evidence of plaintiffs that they did not hear the rapping or the threat to set the car out.

Under generally recognized law, the carrier of passengers has a right to eject with as much force as necessary all persons liable to pay fare who have not paid and who refuse to pay. By the law of Texas it is a misdemeanor to board a train without lawful business, without proper consent, and with intent to obtain a free ride. White's Ann. Pen. Code, art. 1010h. Now, under the law and the facts, as hereinbefore recited, was a case made wherein the company was authorized to call in the local police to open the car and ascertain who among the occupants were without proper transportation and eject them as trespassers? Of this we have little doubt. The time was in the middle of the night. The ordinary agents of the company had failed to accomplish anything at Reisor, and without extra assistance there was much reason to expect the same and as effective opposition in Marshall as at Reisor, at best resulting in either delaying the train or compelling the car to be set out for daylight. If the company had a right to call on the local police to eject the trespassers from the car, how far is it liable for any excesses resulting? In regard to this, the trial judge practically charged the jury that in dealing with the plaintiffs the police were the company's agents, and that the company was responsible for all their acts.

The case shows that the train dispatcher, McMahon, who called in the police, had the authority of the company, and particularly to eject trespassers; therefore all question as to the scope of the agency is eliminated, and with this question out, the authorities are practically unanimous as to the correctness of the rule in regard to the liability of the company for the acts of its agents. Citations of textbooks and adjudged cases are unnecessary.

The liability of the company for the acts of the police being established, we find the charge of the court in reference thereto in the cases of Diefenbach, Doran, and Martin correct, and the exceptions in that behalf not well taken.

The charge of the court as to the forfeiture of passenger rights on the part of Diefenbach, Doran, and Martin, as follows:

"If you believe from the evidence that the plaintiffs Diefenbach, Doran, and Martin, all and each of them, conspired and confederated among themselves and with the plaintiff, A. E. Buck, and with one Charles Mulner and William Corrigan, to have the latter three persons carried on said car from Shreveport to Dallas without the payment of fare, and that, in carrying out such conspiracy and confederation, they and each of them, together and in common with the said three named persons, closed and fastened the doors of said car in which they were riding, and knowingly refused to open the same at the request of the conductors and employés of the defendant when the

latter sought to ascertain who were in said car or to identify the passes and inspect the contracts of carriage of those holding same or to collect fares from or to eject those who were occupying said car without right, if such there were, then you are charged that the said Diefenbach, Doran, and Martin were no longer entitled to the rights and protection of passengers, and became trespassers, and the defendant, through its agents or servants, or through peace officers, had the right to eject and expel said parties from said car upon the opening by them of the doors thereof while same was at Marshall''—

while correct as a general proposition, it, under the evidence in this case, is too restricted and limited, and therein prejudicial to the company and calculated to mislead the jury.

There were three cases under consideration, and, under the charge, it was necessary, in order to find a forfeiture of passenger rights, for the three plaintiffs to conspire with the three trespassers in the car to do the acts suggested with the intent to have the three trespassers carried without paying fare. As we understand the law, if either one of the three plaintiffs who possessed the rights of a passenger, for any improper purpose closed and fastened the doors, and knowingly refused to open the same at the request of conductors and employés of the company when the latter sought to ascertain who were inside the car or to identify the passes and inspect the contracts of carriage of those holding the same, then the jury would be authorized to find that such plaintiff had forfeited his right as a passenger so far as was necessary to carry out the rules and regulations of the company.

It may well be that Diefenbach, who admitted he had the money to buy tickets for Mulner and Corrigan, and whose duty it was to buy such tickets before entering on the trip, should keep the doors closed and the agents of the company out while Martin and Doran, who had no apparent interest in the matter, should take no steps therein.

In regard to the refusal of the charges requested, we find the tenth and twelfth requests worthy of consideration as propositions of law applicable to cases before the jury, and their substance not included in the general charge. The tenth request was as follows:

"It appears that Diefenbach promised at Shreveport to get tickets for Corrigan and Mulner at Reisor. and that by reason of that promise Mulner and Corrigan were allowed to enter the car and be carried to Reisor; then it was his duty to have procured tickets at Reisor, and Corrigan and Mulner would be on the car without right after they passed Reisor, even if they were asleep when the car passed Reisor."

In view of the character of the case and its bearing on the wantonness of the company in calling on the police, the company had a right to have the jury instructed as to whether Diefenbach's assistants, Mulner and Corrigan, admitted to have been in the car, were trespassers, and, if they were, bearing on the right of recovery, Diefenbach's responsibility therefor. The twelfth charge, which is as follows:

"If you believe from the evidence that the persons on the train holding transportation refused to show same, when demanded by the conductor, and that the other persons on the train did not, as promised, buy tickets at Reisor, and refused to show their tickets or to pay fare when demanded by the conductor, then you are instructed that from that time they became trespassers, and the defendant had the right to remove them from the train"—

seems to be correct in law, and to bear directly upon the issues in the case.

In Buck's Case the trial judge charged the jury as follows:

"As to the plaintiff A. E. Buck, you are charged that the undisputed evidence showed he took passage in the stock car at Shreveport with the knowledge and consent of the defendant's agent at Shreveport and of the defendant's conductor in charge of the train from Shreveport to Reisor; that the plaintiff Buck promised the said agent and the conductor he would purchase and pay for tickets at Reisor entitling him to be carried from Shreveport to Dallas, and the undisputed evidence establishes the fact that the plaintiff Buck did not purchase and pay for such tickets at Reisor. You are therefore instructed in any event that the plaintiff Buck became and was a lawful passenger in said car from Shreveport to Reisor. As to whether he continued to be a lawful passenger after the car left the station of Reisor depends upon the existence of the facts as you may find them to be from the evidence. If the plaintiff, Buck, when he took passage in the car at Shreveport, was possessed of sufficient money with which to purchase and pay for a ticket at said Reisor entitling him to ride in said car to Dallas, and if when he took passage at Shreveport he intended in good faith to purchase and pay for such ticket, and if when the station of Reisor was reached he, by reason of being asleep was unaware of that fact and was not awakened at said station, and was not thereat demanded to pay his fare or buy a ticket, and if the plaintiff would have paid his fare or purchased and paid for a ticket at some other station intervening the station of Reisor and the city of Dallas, the payment of which fare or the purchase of which ticket would have entitled him to transportation from Shreveport to Dallas, then you are instructed that the plaintiff herein continued to be a lawful passenger when said car arrived at Marshall, Tex."—

and refused requests of the defendant as follows:

"The fact that the plaintiff A. E. Buck was the owner of some of the horses shipped under the contract entered into by and between W. O. Foote and the defendant would not entitle the said Buck, under the contract with the said Foote, to transportation, and the sole ground on which said Buck was admitted to take passage in said car being that he would at Reisor procure transportation for himself, it was the duty of said Buck to see that said condition was performed as promised, and if he failed to purchase said ticket, as he had agreed to do, then he could no longer claim the rights of a passenger upon defendant's train; but upon failure to procure said ticket at Reisor, and still continuing to remain upon defendant's train, he became a trespasser therein, and defendant had the right to remove him from said train, using such force only as was necessary to accomplish that purpose."

We think that, in the charge as given and in the requests refused, the trial judge erred to the decided prejudice of the company.

As before stated, the car in which Buck entered and remained to pursue his journey was not used for the general transportation of passengers. It was a stock car on a fast freight line, with no facilities or opportunities for the company's agents to pass through and inspect while the train was moving, to take up tickets or collect money fares, even if, as is not shown, the company's train men were authorized to collect and receive money fares. No person was invited by the company to travel in this car, nor under the rules was any person permitted to be carried therein, unless in connection with a contract of the company to carry live stock or on permission with transportation previously paid. Buck understood this fully from the conversations at Shreveport, and he was only allowed to go to Reisor under the promise then and there to buy a ticket. As he failed at Reisor

to buy a ticket, no matter for what reason satisfactory to himself, yet continued on in the car from Reisor, he was not a passenger, and he was unlawfully in the car, and the company had the right to treat him accordingly. Atchison, etc., R. v. Headland, 18 Colo. 477, 483, 33 Pac. 185, 20 L. R. A. 822; Cleveland, etc., R. R. v. Bartram, 11 Ohio St. 463 et seq.; Gardner v. New Haven R. R., 51 Conn. 143, 50 Am. Rep. 12. See Sevier v. Vicksburg, 61 Miss. 8, 48 Am. Rep. 74; Texas & Pacific R. R. v. James, 82 Tex. 306, 18 S. W. 589, 15 L. R. A. 347.

For the errors herein pointed out, all the judgments are reversed, and the cases remanded to the Circuit Court with instructions to award new trials.

SHELBY, Circuit Judge, dissents.